UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| MICHELE M., | Case No.: 19-cv-00272-JLB |
| Plaintiff, | |
| v. | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| ANDREW SAUL, Acting Commissioner of Social Security,[1] | |
| Defendant. | **[ECF Nos. 14; 18]** |

On February 6, 2019, Plaintiff Michele M. filed a Complaint pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability and disability insurance benefits and for Supplemental Security Income ("SSI"). (ECF No. 1.) Before the Court are Plaintiff's Motion for Summary Judgment and the Commissioner's Cross-Motion for Summary Judgment. (ECF Nos. 14; 18.) For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Summary Judgment, **DENIES** the Commissioner's Cross-Motion for Summary Judgment, reverses the decision

---

[1] Andrew Saul is hereby substituted as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

of the Commissioner, and remands this matter for further administrative proceedings consistent with this decision.

## I.    <u>PROCEDURAL BACKGROUND</u>

On March 28 and May 6, 2016, Plaintiff filed applications for a period of disability and disability insurance benefits and SSI under Titles II and XVI, respectively, of the Social Security Act, alleging disability commencing January 24, 2016. (ECF No. 12-5 at 2–7.)[2] After her applications were denied initially and upon reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ") on August 4, 2017. (ECF No. 12-4 at 20.) On July 3, 2018, Plaintiff, her attorney, and vocational expert Shirley Ripp ("the VE") appeared before ALJ MaryAnn Lunderman ("the ALJ"). (ECF No. 12-2 at 34.) In a decision dated August 28, 2018, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 12–32.) The ALJ's decision became the final decision of the Commissioner on December 18, 2018, when the Appeals Council denied Plaintiff's request for review. (*Id.* at 1–6.) Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (ECF No. 1.)

## II.    <u>SUMMARY OF THE ALJ'S FINDINGS</u>

In rendering her decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 24, 2016, her alleged disability onset date. (ECF No. 12-2 at 18.)

At Step Two, the ALJ found that Plaintiff had the following severe impairments: connective tissue disease; neuropathy in the right hand; carpel tunnel syndrome in the left hand; left ankle pain;[3] and morbid obesity. (*Id.*)

---

[2]    All page numbers in this Order refer to the page numbers provided by the CM/ECF system.

[3]    In a seeming inconsistency, the ALJ also found "ankle pain" to be a non-severe impairment. (ECF No. 12-2 at 19.)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments. (*Id.* at 22.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with certain exceptions. (*Id.* at 23.) Specifically, the ALJ determined that:

> the climbing of ramps and stairs must be limited to frequently, while the climbing of ladders, ropes, or scaffolds must be precluded entirely from the work duties as assigned. Balancing, stooping (bending at the waist), kneeling, crouching (bending at the knees), crawling, handling (gross manipulation) and fingering (fine manipulation) with the bilateral upper extremities must be limited to frequently. Within the assigned work area, there must be no exposure to unprotected heights and fast[-]moving machinery.

(*Id.*)

At Step Four, the ALJ determined that Plaintiff "was capable of performing past relevant work as a social worker aide" because such "work does not require the performance of work-related activities precluded by [Plaintiff's] [RFC]." (*Id.* at 26.) The ALJ accepted the VE's testimony that Plaintiff's "[RFC] does not preclude [Plaintiff] from performing her past work as a social-service aid as it is generally performed in the national economy." (*Id.*) Accordingly, the ALJ found that Plaintiff was not disabled under the Social Security Act and did not proceed to Step Five of the sequential evaluation process—whether Plaintiff was able to perform any other work. (*Id.* at 28.)

### III.   <u>STANDARD OF REVIEW</u>

The Social Security Act allows for unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review, however, is limited. The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error; or (2) the ALJ's determinations are not supported by substantial evidence in the record as a whole. *See Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence is "more than a mere scintilla, but may be less than a preponderance." *Lewis v.*

*Apfel*, 236 F.3d 503, 509 (9th Cir. 2001). Substantial evidence is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." *Id.*; *accord Howard* ex rel. *Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003).

In making this determination, the Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. *See Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Where the evidence can reasonably be construed to support more than one rational interpretation, the Court must uphold the ALJ's decision. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. *See Lewis*, 236 F.3d at 509.

## IV. PLAINTIFF'S CLAIMS OF ERROR

Plaintiff raises the following claims of error in her Motion for Summary Judgment:

1. Can the ALJ's decision be supported by substantial evidence where the RFC determination failed to consider the impact of Plaintiff's mental impairments?

2. Can the ALJ's decision be supported by substantial evidence where the ALJ's rejection of Plaintiff's testimony is contradicted by the record and the ALJ's reasoning failed to consider the entire record?

3. Can the ALJ's decision be supported by substantial evidence where the ALJ cherry-picked portions of the record to support her ultimate conclusion of non-disability while ignoring significant portions of the record that support Plaintiff's claim of disability? (ECF No. 14-1 at 7.)

///
///
///
///
///

# V. DISCUSSION

## A. Whether the ALJ Erred by Failing to Consider Plaintiff's Non-Severe Mental Impairments When Determining Her RFC

### 1. Parties' Arguments

Plaintiff challenges the ALJ's RFC determination and argues that it was not supported by substantial evidence because the ALJ failed to consider Plaintiff's non-severe mental impairments. (*Id.* at 15–17.) Plaintiff provides that "[i]n assessing the RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" (*Id.* at 15 (quoting *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2008)).) Plaintiff argues that the ALJ found that Plaintiff had non-severe but medically determinable mental impairments, yet "failed to even mention [Plaintiff's mental] limitations in the [RFC] assessment." (*Id.*)

The Commissioner argues that the ALJ properly determined that Plaintiff's mental impairments were not severe, but he is silent as to whether the ALJ considered Plaintiff's non-severe mental impairments when determining the RFC. (ECF No. 18-1 at 3.) In reply, Plaintiff argues that the Commissioner failed to address Plaintiff's claim and clarifies that her argument is not that the ALJ erred in finding Plaintiff's mental impairments as not severe but that the ALJ did not consider her non-severe mental impairments when determining her RFC. (ECF No. 20 at 3.) Plaintiff again contends that an ALJ "must consider the combination of impairments—both severe and non-severe—when determining the RFC." (*Id.* (citing *Buck*, 869 F.3d at 1049).)

### 2. Relevant Background Relating to Plaintiff's Mental Impairments

Plaintiff is a 60-year-old female who suffers from anxiety, depression, and post-traumatic stress disorder ("PTSD"). She grew up in an abusive household and was beaten by her father beginning at age four. (ECF No. 12-6 at 79.) She was also sexually abused beginning at age four. (*Id.*; ECF Nos. 12-8 at 53; 12-15 at 21.) She was forced into prostitution when she was sixteen years old and was abused by her "pimp," her then-boyfriend and current ex-husband. (ECF Nos. 12-6 at 79; 12-7 at 108, 129; 12-8 at 52, 54;

12-15 at 3, 22.) She spent three-and-a-half or four-and-a-half years in federal prison. (ECF Nos. 12-6 at 79; 12-8 at 52.) She has a history of methamphetamine and cocaine use but has been clean for over twenty years. (*See* ECF No. 12-8 at 50, 52.) She does not sleep well, experiences night terrors, and sometimes "wakes up in a panic." (*Id.* at 52; ECF No. 12-15 at 22.)

In June 2016, Plaintiff presented to Dr. Thomas A. Schweller for a neurological consultation. (ECF No. 12-7 at 129.) Dr. Schweller described Plaintiff's mental status as follows: "She was able to remember one of three objects after five minutes, confabulating a pear and a banana. She remembered the street address 1600 Pennsylvania Avenue and knew it was the home of the President. Her affect was depressed. Her communication skills were intact." (*Id.* at 130.) Under "impressions," Dr. Schweller found that Plaintiff suffered from "anxiety, depression, and [PTSD]." (*Id.* at 131.) Under "functional capacity," Dr. Schweller noted that Plaintiff appeared to suffer from "a significant depressive disorder and [PTSD] that may best be addressed by a psychiatrist." (*Id.*)

In August 2016, Plaintiff presented to Dr. Jaga Nath Glassman for a psychiatric disability evaluation. (ECF No. 12-8 at 50.) Dr. Glassman evaluated Plaintiff's mental status and noted the following:

> The claimant arrived about ten minutes early for the appointment. She was a well-developed, well[-]nourished-appearing, obese Caucasian female, appearing her stated age. She was clean, neat, well-groomed, and attractive in her physical presentation. She was wearing decent blue jeans, an attractive blue blouse, and nice flip-flops. Her blond hair appeared slightly-dirty appearing and not well-groomed. She was wearing some nice makeup and lipstick, and nice jewelry. She had lovely pink toenail polish. She carried a nice purse with her.
>
> She was well-engaged with the examiner, making and maintaining good eye contact. She was calm, cooperative, polite, and respectful in her attitude and demeanor. Her mood did not appear elevated, but she spoke rapidly, with pressured speech, and some tangentiality. This seemed to be related to anxiety. She calmed with some support. She was not pervasively sad or down or dysphoric. She did show marked affective lability. She was

tearful at times. At other times, she smiled nicely, and demonstrated a responsive mood. There was a coarse, brusque quality.

Her thought processes were coherent, relevant, and goal-directed, and there was no evidence of a Schizophrenic Thought Disorder, or of any psychotic symptoms. She has some difficulty following instructions, rambling and going off track in a circumstantial, anxious manner. There was no grossly odd or bizarre behavior.

Cognitively, she presented as of average intellectual functioning. She was alert and oriented x 3. She repeated three of three words immediately, remembered two of three words at five minutes, three of three with a hint. She did Serial 3's fairly well. She used her fingers to do a money-changing problem, and eventually gave the correct answer. She interpreted a proverb appropriately. She knew the current president and the recent past presidents. She knew the sun rises from the east. She correctly named the capital of New Jersey, where she grew up.

(*Id.* at 53.)

Dr. Glassman diagnosed Plaintiff, in relevant part, with dysthymic disorder, generalized anxiety disorder, methamphetamine and cocaine abuse in long-term remission, and mixed personality disorder with borderline and antisocial features. (*Id.* at 54.) Dr. Glassman gave Plaintiff a Global Assessment of Functioning ("GAF") score of 55[4] and noted that she was "not taking care of her grooming that well." (*Id.*) Dr. Glassman further found that Plaintiff "has moderate impairment in her capacity to get along adequately with others and to behave in a socially-appropriate manner, due to her anxiety, depression, [and] dysfunctional personality features," "mild impairment in her capacity to understand and follow even simple instructions consistently," and "moderate impairment in her capacity to maintain concentration, persistence, and pace, and to adapt to changes and stresses in a

---

[4] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (citing *Diagnostic and Statistical Manual of Mental Disorders* 20 (3d ed., rev. 1987)). "A GAF score of 55 indicates at least moderate symptoms or moderate difficulty" in social or occupational functioning. (*Id.*)

workplace setting." (*Id.* at 54–55.)  Dr. Glassman opined that "[c]onsistent, ongoing treatment could help decrease her symptoms and improve her functioning." (*Id.* at 55.)

In May 2016, Plaintiff's son, Marquise M., completed a Third-Party Function Report.  (ECF No. 12-6 at 14.)  Marquise's report contained the following observations and opinions about Plaintiff's mental health: Plaintiff is homeless, and Marquise is "pretty sure" she is bipolar because he "never know[s] how she is going to be." (*Id.*)  She suffers from PTSD and "from being on the streets and in prison," and "she doesn't do anything but stay by a bathroom and . . . is so depressed she sleeps a lot." (*Id.* at 14–15.)  She "has night terrors every night" and "nightmares of being abused." (*Id.* at 15.)  She "doesn't care" how she dresses and sometimes Marquise has to "remind her to bathe or wash [her] hair." (*Id.* at 16.)  She "doesn't have hobbies anymore," "gets confused and frustrated," and is "very irr[it]able." (*Id.* at 18.)  She "has a hard time doing anything" and "doesn't like being around [people]." (*Id.*)  She "is very difficult to get along with." (*Id.* at 19.)  She "doesn't focus too well at all," and it is "hard for her to con[ce]ntrate." (*Id.*)

The record includes a letter dated June 2018 from Claire Marton, Plaintiff's case manager at Mental Health Systems ("MHS").  (*Id.* at 78.)  In the letter, Ms. Marton provided that Plaintiff "has a good relationship with her son and grandkids who live out-of-state" but "is in long-term recovery from drug and alcohol abuse and is a survivor of trauma in early childhood and adulthood." (*Id.*)  Ms. Marton further provided that Plaintiff "participates in medication management, psychiatry[,] and therapy at MHS Kinesis to address her [bipolar] disorder and chronic anxiety." (*Id.*)  From Ms. Marton's "perspective, [Plaintiff] is doing all she can to take care of herself." (*Id.*)

During the administrative hearing, Plaintiff's counsel asked Plaintiff about how she interacts with people, and she responded:

> I've had a rough life and, you know, I used to be kind of happy go lucky, and stuff, you know, but I'm just broke now, and I'm burned out, I'm sad, and it's hard for me to get along with people [anymore] because I just, it's rough for me.  It's just really hard for me.

8

(ECF No. 12-2 at 50.) When asked if she engaged in any social activities, Plaintiff answered, "No. I don't do anything. I can't now. I'm homeless, and I just really kind of don't want to do anything, you know." (*Id.*) When asked about the abuse she suffered in the past from her ex-husband, Plaintiff explained how it was something that still bothered her every day:

> I have trouble sleeping, you know. I mean I have nightmares about it. Every night I wake up in the middle of the night crying. I have a friend that I brought with me here today that, that said she would be willing to testify that . . . when I spend the night and on her couch, several nights I've woken her up, and even her ten-year-old daughter said that I've woken her up in the middle of the night crying. They've heard me crying in the middle of the night and stuff while I'm sleeping. I'll be whimpering, and things, you know, yeah. It's really bad. And not only when it's that, in the daytime it's hard for me. You know, I try not to cry just thinking about my body, you know, how badly my body is, and the aches and pains that I have, you know. I cannot think about him. It was a way of life. It wasn't just something that I can get over. It was . . . horrible. It was torture living with him, what he did to me . . . .

(*Id.* at 50–51.)

### 3. The ALJ's Decision

At Step 2, the ALJ found that Plaintiff had medically determinable mental impairments of depression, PTSD, and anxiety, but the impairments were not severe. (*Id.* at 20.) In making this finding, the ALJ assessed Plaintiff's mental impairments pursuant to the four broad functional areas as required by the regulations, or the "Paragraph B" criteria. 20 C.F.R. §§ 404.1520a, 416.920a. The ALJ determined that Plaintiff had: (1) mild limitations in understanding, remembering, or applying information; (2) mild limitations in interacting with others; (3) mild limitations in her ability to concentrate, persist, or maintain pace; and (4) mild limitations in her ability to adapt or manage herself. (ECF No. 12-2 at 20–21.)

In reaching these conclusions, the ALJ first considered and gave great weight to the opinion of non-examining state agency psychological evaluators Drs. George Grubbs and Preston Davis. (*Id.* at 21.) The ALJ noted that Drs. Grubbs and Davis found that, in

September 2016 and June 2017, respectively, Plaintiff "had mild limitations in mental functioning." (*Id.*) The ALJ then asserted that Plaintiff had "received significant treatment and is on medications that [have] proven affective at controlling her symptoms." (*Id.* at 22.)

The ALJ next considered the opinion of Dr. Glassman, stating:

I have given some weight to the statements of the psychological consultative examiner. Jaga Glassman, MD, reported the claimant was not receiving any kind of psychiatric or mental health treatment. 10F/4. She complained of depression and anxiety. She insisted she was unable to get along with others. 10F/3. A mental status examination was near normal. The claimant appeared clean, neat, and well-groomed. She was wearing makeup, lipstick, nice jewelry[,] and lovely pink toenail polish and nice purse. She was calm, cooperative[,] and polite. Her mood was elevated but she had pressured speech. Her thought process was coherent, relevant[,] and goal-directed. She had some difficulties in following instructions. She was of average intelligence. She had minimal difficulty on testing of her memory and concentration. 10F/5. Dr. Glassman found moderate limitations in interacting with others and in concentration, persistence[,] and pace. Dr. Glassman suggest[ed] that with consistent and ongoing treatment[,] the claimant's symptoms would decrease [and] functioning would improve. 10F/7. This appears to be the case. The medical evidence indicates the claimant has since received consistent treatment for her mental health issues. 12E/1, 25.[5] As previously discussed, the treatment records indicate she is doing quite well on medication with no adverse reactions. 25F/8, 12, 14. With that said, her mental status examinations have also been generally unremarkable. Notably, her speech is of normal rate, tone, and volume. 25F/2. Therefore, I have assigned great weight to the opinion of Dr. Glassman.

(*Id.* (footnote added).)

Lastly, the ALJ considered and assigned some weight to the statements of Ms. Marton, Plaintiff's case manager at MHS. (*Id.*) The ALJ noted that Ms. Marton's statements "suggested" that Plaintiff "is capable of managing her psychiatric care," and

---

[5] The ALJ cites to "12E/25," but no such page exists in the Administrative Record.

Ms. Marton's "letter [did] not appear to indicate any significant difficulties with mental functioning." (*Id.*)

Within her Step 2 analysis, the ALJ specifically acknowledged:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(*Id.* at 21.) Despite this acknowledgement, and despite her recognition that in determining an individual's RFC, an ALJ must "consider all of the claimant's impairments, including impairments that are not severe" (*id.* at 17), the ALJ did not address Plaintiff's medically determinable mental impairments at Step 3, where she analyzed whether any impairments, alone or in combination, were of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404. Thereafter, the ALJ assigned Plaintiff an RFC without including any mental restrictions.

4. <u>Applicable Law</u>

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* In determining a claimant's RFC, the ALJ must consider "all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). If a claimant has more than one impairment, the ALJ must consider all medically determinable impairments, including "medically determinable impairments that are not 'severe.'" 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *accord Buck*, 869 F.3d at 1048–49 (quoting 1996 WL 374184, at *5).

In assessing mental abilities specifically, the ALJ must consider the nature and extent of the claimant's mental limitations and restrictions to determine the claimant's RFC "for work activity on a regular and continuing basis."  20 C.F.R. §§ 404.1545(c), 416.945(c).  A claimant's "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [his or her] ability to do past work and other work."  *Id.*

   5.   Discussion

      a.   *The ALJ Erred by Not Considering—or Not Clarifying Whether She Considered—Plaintiff's Non-Severe Mental Impairments When Determining the RFC*

As argued by Plaintiff, the ALJ was required to consider all of Plaintiff's medically determinable impairments, including her non-severe mental impairments, when determining the RFC.  (ECF No. 14-1 at 15–17.)  Plaintiff asserts that the ALJ erred because the ALJ did not consider her non-severe mental impairments when determining the RFC.  (*Id.*)  The Court recognizes that "*consideration* of 'the limiting effects of all impairments' does not necessarily require the *inclusion* of every impairment into the final RFC if the record indicates the non-severe impairment does not cause a significant limitation in the plaintiff's ability to work."  *Medlock v. Colvin*, No. CV 15-9609-KK, 2016 WL 6137399, at *5 (C.D. Cal. Oct. 20, 2016).   But because the Court cannot discern definitively from the hearing decision whether the ALJ considered Plaintiff's non-severe mental impairments and any corresponding limitations before assigning Plaintiff an RFC without any mental restrictions, the Court finds error.

As detailed above, at Step 2, the ALJ conducted a Paragraph B analysis and found that Plaintiff had: (1) mild limitations in understanding, remembering, or applying information; (2) mild limitations in interacting with others; (3) mild limitations in her ability to concentrate, persist, or maintain pace; and (4) mild limitations in her ability to adapt or manage herself.  (ECF No. 12-2 at 20–21.)  After the ALJ conducted her Paragraph

B analysis, the ALJ addressed some[6] of the medical providers who opined on Plaintiff's mental limitations and the weight she gave to each of their opinions.[7]

In the ALJ's discussion of Plaintiff's non-severe mental impairments, the ALJ indicated she relied heavily on the opinion of Dr. Glassman. The ALJ first assigned "some weight" to Dr. Glassman's opinion, highlighting that Dr. Glassman found that Plaintiff had "moderate limitations in interacting with others and in concentration, persistence[,] and pace" and suggested that treatment would[8] improve Plaintiff's symptoms. (*Id.* at 22.) The ALJ then continued on to find that Plaintiff "has since received consistent treatment for her mental health issues" and "treatment records indicate she is doing quite well on medication with no adverse reactions." (*Id.*) The ALJ then simply stated that she assigned "great weight" to Dr. Glassman's opinion without further explanation or conclusion.

The Court finds no explanation from the ALJ as to why, while crediting Dr. Glassman's opinion—which, as detailed above, stated that Plaintiff's mental limitations

---

[6] The ALJ did not discuss Dr. Schweller's opinion, which provided that Plaintiff appeared to suffer from "a significant depressive disorder and [PTSD]." (ECF No. 12-7 at 131.) Further, although not a medical record, the ALJ did not discuss Plaintiff's son's Third-Party Function Report. *See Lahti v. Berryhill*, No. 1:17-CV-00080-REB, 2018 WL 4643055, at *5 (D. Idaho Sept. 27, 2018) ("The law is clear that friends and family members—who, by definition, will seldom be disinterested—are nonetheless competent to testify."); *Flores v. Comm'r of Soc. Sec.*, No. 1:16-CV-00878-SAB, 2017 WL 2797861, at *9 n.5 (E.D. Cal. June 28, 2017) ("The Ninth Circuit has found that 'friends and family members in a position to observe a [plaintiff's] symptoms and daily activities are competent to testify as to [his or] her condition.'" (quoting *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009))).

[7] It is not clear whether this was part of the ALJ's Step 2 analysis, Step 3 analysis, or an out-of-order RFC analysis limited to Plaintiff's mental health impairments. The ALJ notes that "the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis" (ECF No. 12-2 at 21), but it is unclear whether "the following" refers to the next several paragraphs or the next section of the hearing decision.

[8] Dr. Glassman actually opined that "ongoing treatment *could decrease*" Plaintiff's symptoms and improve her functioning. (ECF No. 12-8 at 55 (emphasis added).)

imposed both mild and moderate impairments—she nonetheless rejected the opinion by concluding that Plaintiff was "doing well" on unspecified medication. Moreover, and more importantly, the ALJ did not explain how, if at all, her assessment of Plaintiff's non-severe mental impairments factored into her RFC determination. The ALJ's discussion of Plaintiff's RFC contains no reference to Plaintiff's mental impairments or reference to the ALJ's own findings of mental limitations at Step 2. The ALJ does not explain why, after finding Plaintiff had mental limitations, she omitted these limitations from the RFC. *See Hutton v. Astrue*, 491 F. App'x 850, 851 (9th Cir. 2012) ("Further, while the ALJ was free to reject [the claimant's] testimony as not credible, there was no reason for the ALJ to disregard his own finding that [the claimant's] non[-]severe PTSD caused some 'mild' limitations in the areas of concentration, persistence, or pace."); *Palafox v. Saul*, No. CV 19-1517 SS, 2020 WL 752153, at *5 (C.D. Cal. Jan. 10, 2020) ("Here, the ALJ found that Plaintiff had mild limitations in 'understanding, remembering, or applying information,' and in 'concentrating, persisting, or maintaining pace.' However, the ALJ gave no indication that he considered these limitations in determining Plaintiff's RFC.").

The hearing decision does not conclusively indicate that the ALJ considered Plaintiff's non-severe mental impairments when determining the RFC or that the ALJ's omission of any mental restrictions in the RFC was intentional. The closest she comes to doing so is the one vague and conclusory assertion that "the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental functioning analysis." (ECF No. 12-2 at 21.) It may be that the ALJ did consider Plaintiff's non-severe mental impairments when determining the RFC and that the ALJ's general findings concerning Plaintiff's symptoms being "controlled" by medication were the reason the ALJ did not include any mental limitations in the RFC. However, this is speculative, as the ALJ does not provide this explanation herself. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("[A court] cannot substitute [its] conclusions for the ALJ's, or speculate as to the grounds for the ALJ's conclusions. Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning

in order for [the court] to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." (citation omitted)).

The Court finds the decision in *Soloman v. Commissioner of Social Security* to be analogous and persuasive. 376 F. Supp. 3d 1012 (D. Ariz. 2019). In *Soloman*, the ALJ found that the plaintiff had non-severe mental impairments and in applying the Paragraph B criteria, found that the plaintiff "had (1) no limitation in activities of daily living; (2) mild limitation in social functioning; (3) mild limitation in concentration, persistence, and pace; and (4) no episodes of decompensation." *Id.* at 1020. The district court stated that, despite the ALJ's findings, "the RFC didn't incorporate any of the non-severe mental limitations that had been identified at Step 2" and that the ALJ did not "discuss with any particularity [the plaintiff's] mental limitations, only briefly noting two medical opinions regarding mental health and giving them 'substantial weight.'" *Id.* The court ultimately found that the ALJ erred because he or she "determined [the plaintiff] had mental limitations that caused mild limitation in social functioning and concentration, persistence, and pace" but the hearing decision "provide[d] no indication that the ALJ considered those limitations when calculating [the plaintiff's] RFC at Step 4." *Id.* at 1021. The court further found that the omissions were not harmless error "because the ALJ ultimately determined that [the plaintiff] could perform" past work as a project estimator, and it was possible that the plaintiff's "limitations in concentration, persistence, and pace could prevent him from performing" this skilled work. *Id.*

As in *Soloman*, the ALJ here did not make it clear that she considered Plaintiff's non-severe mental limitations and consciously concluded that no mental limitations were required in the RFC. Nor did the ALJ explain the significance of her assessment of Dr. Glassman's, Drs. Grubb's and Davis's, or Ms. Marton's opinions before proceeding to her RFC analysis. The Court finds that this constitutes error.

///

///

///

b. *The ALJ's Determination that Plaintiff Was "Doing Quite Well" on Medication Is Not Supported by Substantial Evidence*

Even assuming that the ALJ considered Plaintiff's mental limitations and consciously excluded them from the RFC based upon a determination that the limitations were no longer present, the Court would still find error. The medical records the ALJ cited to in her assessment following her Paragraph B analysis are not adequate to support a conclusion that the mental limitations identified by the ALJ herself (ECF No. 12-2 at 21) were no longer present.

As support for the finding that Plaintiff had received "consistent treatment for her mental health issues," the ALJ cited only to Ms. Marton's letter. (*Id.* at 12-2 at 22; ECF No. 12-6 at 78.) However, Ms. Marton stated only that Plaintiff "participates in medication management, psychiatry[,] and therapy at MHS Kinesis to address her [bipolar] disorder and chronic anxiety," and "from [Ms. Marton's] perspective, [Plaintiff] is doing all she can to take care of herself." (*Id.*) Nothing in Ms. Marton's letter fairly supports the conclusion that Plaintiff was receiving *consistent* treatment for *all* of the non-severe mental impairments identified by the ALJ: depression, anxiety, and PTSD. (ECF No. 12-2 at 20.)

Further, as support for the findings that Plaintiff was "doing quite well on medication" and that medication had "proven affective at controlling her symptoms," the ALJ cited to three pages of progress notes from the North Inland Mental Health Center. (*Id.* at 22.) The records cited to by the ALJ provide that on January 11, 2018, Plaintiff reported that she "was still doing well on her current med[ications] but ha[d] additional anxiety in the context of various situational stressors." (ECF No. 12-15 at 13.) Dr. Douglas Conte, psychiatrist, noted that she had a "good response" to her medication and increased her Vistaril dose to 25mg. (*Id.* at 14.) On February 15, 2018, Plaintiff reported that "Vistaril [was] slightly helpful" for anxiety and her response to medication was "fair/good." (*Id.* 11–12.) However, she also reported experiencing an increase in depression and was especially anxious due to situational stressors. (*Id.* at 11.) On June 1,
///

2018, Plaintiff reported that "[B]uspirone helps with anxiety," but she was experiencing "intrusive thoughts/flashbacks." (*Id.* at 8.)

Although these three records indicate that medication may have helped Plaintiff's anxiety from January to June 2018, Plaintiff still reported anxious symptoms in the form of situational stressors, as well as symptoms from depression and PTSD. In fact, the records reveal little to nothing about any improvement or treatment for Plaintiff's depression and PTSD. It appears the ALJ focused only on the fact that Plaintiff's general response to her medication was "good" or "fair" during these few months, while ignoring the fact that Plaintiff continued to report symptoms of depression, anxiety, and PTSD. *See Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014) ("Reports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms."). For example, on June 29, 2018, in a progress note not cited to by the ALJ, Plaintiff complained that her nightmares were back and she was screaming in her sleep. (*Id.* at 2.) Plaintiff further reported that she "ha[d] not seen significant improvement of mood" in response to the medication, "Buspirone help[ed] with anxiety," and she was still having "intrusive thoughts/flashbacks." (*Id.* at 3–4.) Accordingly, the Court finds that the records cited to by the ALJ do not reasonably support a conclusion that the limitations the ALJ herself found were no longer present. *See also Hutsell v. Massanari*, 259 F.3d 707, 712 (9th Cir. 2001) ("We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that [the plaintiff] was 'doing well,' because doing well for purposes of the treatment program has no necessary relation to a claimant's ability to work or her work-related functional capacity."); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[A physician's] statements must be read in the context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

///

c. *The ALJ's Error Is Not Harmless*

The Court finds that the ALJ's failure to consider Plaintiff's non-severe mental impairments when determining the RFC is not harmless error. Harmless error is defined as error that is "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006). The ALJ's conclusions must be supported by substantial evidence, and the error must not negate the validity of the ALJ's ultimate conclusion. *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).

As stated above, at Step 4, the ALJ determined that Plaintiff could return to her past work as a social worker aide, specifically noting that "[t]his work does not require the performance of work-related activities preclude by the" RFC. (ECF No. 12-2 at 26.) According to the Dictionary of Occupational Titles ("DOT"), work as a social worker aide, or "social-services aide," has a specific vocational preparation ("SVP") level of 6 and is therefore "skilled work."[9] *Social-Services Aide*, DOT 195.367-0.4, 1991 WL 671601 (Jan. 1, 2016); SSR 00-4P, 2000 WL 1898704, at *3 (Dec. 4, 2000) ("[S]killed work corresponds to an SVP of 5-9 in the DOT."). The DOT describes the requirements of a social-services aide as follows:

> Assists professional staff of public social service agency, performing any combination of the following tasks: Interviews individuals and family members to compile information on social, educational, criminal, institutional, or drug history. Visits individuals in homes or attends group meetings to provide information on agency services, requirements, and procedures. Provides rudimentary counseling to agency clients. Oversees

---

[9] "Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced. Skilled work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity." 20 CFR §§ 404.1568(c), 416.968(c).

day-to-day group activities of residents in institution. Meets with youth groups to acquaint them with consequences of delinquent acts. Refers individuals to various public or private agencies for assistance. May care for children in client's home during client's appointments. May accompany handicapped individuals to appointments.

1991 WL 671601. Given that the ALJ found that Plaintiff had "mild limitations in interacting with others" (ECF No. 12-2 at 21), it is possible that limitations in social interactions—which appears to be a significant portion of a social-services aide's duties— could prevent Plaintiff from returning to her past work. Also, the VE testified that if Plaintiff was limited to work with "occasional public contact interaction" it would "affect" her work as a social-services aide. (*Id.* at 55.) Additionally, the work of a social-services aide has a Reasoning Level of 4, which expects someone to be able to "[i]nterpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form." 1991 WL 671601. Given that the ALJ also found that Plaintiff had "mild limitations" in "understanding, remembering, or applying information," it is also possible that these limitations could prevent Plaintiff from returning to her past work.

Therefore, had the ALJ considered Plaintiff's non-severe mental impairments when determining the RFC, the ALJ may have concluded that Plaintiff did not have an RFC to perform the requirements of her past work. The ALJ's error prevented her from proceeding to Step 5—whether Plaintiff is able to do any other work considering her RFC, age, education, and work experience. Thus, the ALJ's error is not harmless.

6. Conclusion

As stated above, because the hearing decision does not make clear whether the ALJ affirmatively considered Plaintiff's non-severe mental impairments and their corresponding limitations when determining Plaintiff's RFC, the Court finds that the ALJ erred. Further, because it is possible that the ALJ would have concluded that Plaintiff could not return to her past work as a social worker aide had the ALJ properly considered Plaintiff's non-severe mental impairments, and the ALJ stopped at Step 4, the ALJ committed error that is not harmless. This error alone is grounds for remand. As a result

of the Court's inability to affirm the ALJ's RFC determination, the Court need not reach the other disputed issues raised by Plaintiff.

**B.    Scope of Remand**

1.    <u>Applicable Law</u>

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017).  This applies particularly "[i]f additional proceedings can remedy defects in the original administrative proceeding." *Garrison*, 759 F.3d at 1019.  But there is an exception to this rule, known as the "credit-as-true" rule, under which the court may remand with instructions to calculate and award benefits.  For this rule to apply, a three-part test must be satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id.* at 1020.

2.    <u>Parties' Arguments</u>

Plaintiff argues that the Court should apply the credit-as-true rule and remand the case to the ALJ for a calculation and award of benefits. (ECF No. 14-1 at 24–27.)  Plaintiff first argues that if Dr. Glassman's opinion concerning Plaintiff's mental limitations was properly considered, the ALJ would be required to find Plaintiff disabled.  (*Id.* at 25–26.)  As support for this proposition, Plaintiff cites to the VE's testimony, which states that if Plaintiff was limited to work with "occasional public contact interaction," it would "affect" her past relevant work as a social worker aide.  (*Id.* at 26.)  Plaintiff then concludes that because the VE opined that Plaintiff did not have any transferrable skills, on remand, the ALJ would be required to find Plaintiff disabled.  (*Id.*)  Plaintiff next argues that if her complaints concerning her physical impairments were properly considered, the ALJ would be required find her disabled.  (*Id.* at 26–27.)  The Commissioner argues that, should the

Court find the ALJ committed non-harmless error, the proper remedy is a remand for further proceedings, and not an award of benefits, as the record "casts serious doubt" that Plaintiff is disabled. (ECF No. 18-1 at 16.)

3.   Discussion

The Court is mindful of Ninth Circuit authority for the proposition that, where an ALJ failed to properly consider either subjective symptom testimony or medical opinion evidence, it is sometimes appropriate to credit this evidence as true and remand the case for a calculation and award of benefits. *See Garrison*, 759 F.3d at 1020. However, in *Ghanim v. Colvin*, a case decided after *Garrison*, another Ninth Circuit panel simply remanded the case for further administrative proceedings without even addressing the credit-as-true rule, even though the panel determined that substantial evidence did not support the ALJ's rejection of treating medical opinions or his adverse credibility determination. 763 F.3d 1154 (9th Cir. 2014). And, in *Marsh v. Colvin*, the panel did not apply or even acknowledge the credit-as-true rule where the ALJ had failed to even mention a treating source's opinion that the claimant was "pretty much nonfunctional"; instead, the panel simply remanded the case to afford the ALJ the opportunity to comment on the doctor's opinions. 792 F.2d 1170, 1173 (9th Cir. 2015).

Here, Plaintiff has not made a persuasive argument that the credit-as-true rule should apply. Assuming, *arguendo*, that Plaintiff has even satisfied parts one and two of the rule, Plaintiff's argument fails at part 3. Although the VE testified that she did not "believe" that Plaintiff acquired any transferable skills from her past work (ECF No. 12-2 at 54), "[w]hen it comes to the transferability of skills, an ALJ is required to make particular findings of fact in the written decision, supported with appropriate documentation, regarding what transferable skills a claimant has obtained, and to what jobs those skills are transferable." *Salazar v. Astrue*, 859 F. Supp. 2d 1202, 1222 (D. Ore. 2012). The ALJ made no findings in the hearing decision as to whether Plaintiff acquired any transferable skills from her past work. Further, "transferability of skills 'is precisely the sort of finding . . . that SSR 82-41 requires the ALJ, and not the court, to make." *Id.* (quoting *Bray v.*

*Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219 (9th Cir. 2009)); *see also* SSR 82-41, 1982 WL 31389, at *4 (Jan. 1, 1982) ("Skills, levels of skills and potential occupations to which skills from [past relevant work] may be transferred are for the adjudicator or ALJ to determine (with the assistance, when required, of a [vocational specialist] or occupational reference sources)."). Therefore, the Court cannot make any findings as to whether Plaintiff acquired transferable skills from her past work as a social worker aide, and ultimately, whether a lack of transferable skills would necessitate a finding of disabled.

Additionally, Plaintiff argues that crediting Plaintiff's complaints concerning her physical ailments would require a finding of disabled, but Plaintiff does not explain why. Plaintiff merely reiterates her argument that the ALJ erred in rejecting her complaints without further analysis as to why Plaintiff would necessarily be found as disabled if her complaints were credited-as-true. Accordingly, the Court declines Plaintiff's request to apply the credit-as-true rule and finds that the appropriate remedy in this case is a remand to the ALJ for further proceedings.

## VI.   **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and **DENIES** the Commissioner's Cross-Motion for Summary Judgment. (ECF Nos. 14; 18.) Judgment shall be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: March 25, 2020

Hon. Jill L. Burkhardt
United States Magistrate Judge

19-cv-00272-JLB